NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

                          Plaintiff,

       v.

BERNARD GREENSPAN,

                          Defendant.

**OPINION**

Cr. No. 16-114 (WHW)

**Walls, Senior District Judge**

       Defendant Bernard Greenspan has been indicted in this Court on ten charges relating to his alleged role in a Medicare billing bribery and kickback scheme. He brings an omnibus motion seeking various forms of relief, including dismissal of the entire indictment for violations of his privilege against-self-incrimination under the Fifth Amendment to the United States Constitution, dismissal of several charges for failure to state a claim and impermissible statutory vagueness, and an order requiring early production of discovery material by the United States. The Government opposes the motion. Decided without oral argument, Defendant's motion is denied.

## PROCEDURAL AND FACTUAL BACKGROUND

       Except where otherwise noted, the following facts are taken as alleged in the criminal indictment of Defendant Greenspan, returned by a grand jury in and for the District of New Jersey, sitting in Newark on March 8, 2016. ECF No. 1. Between March 2006 and April 2013, Defendant Bernard Greenspan, a licensed medical doctor who practiced medicine in Bergen County, New Jersey, *id.* ¶¶ 2, 4, is a general practitioner and the sole owner of Bernard Greenspan, D.O., P.A. (the "Medical Practice"). Mem. Supp. Def. Omnibus Mot., ECF No. 7-12

NOT FOR PUBLICATION

at 3. Between March 2006 and April 2013, non-party Biodiagnostic Laboratory Services, LLC ("BLS") was a clinical blood laboratory based in Parsippany, New Jersey that, among other things, performed tests on the blood specimens of patients referred to BLS by medical doctors. ECF No. 1 ¶ 1(a). In exchange for performing such tests, BLS billed and was paid by both private insurance companies and the Medicare Part B program, a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f) and "health care benefit program" defined by 18 U.S.C. § 24(b). *Id.* ¶¶ 1(a)-(e). BLS paid sales representatives to recruit or service medical doctors and paid these representatives a commission based on the amount of revenue received by BLS from private insurers and the Medicare program for the performance of blood tests and related services referred by these doctors. *Id.* ¶ 1(f). Individuals allegedly associated with BLS included David Nicoll, the owner and president of BLS, *id.* ¶ 1(g), Scott Nicoll, an employee of BLS who caused the formation of an entity called Nicoll Brothers Consulting, LLC in 2010, *id.* ¶ 1(h), Craig Nordman, a BLS sales representative who caused the formation of an entity called Advantech Sales, LLC in 2010, *id.* ¶ 1(i), and William Daley, who acted on behalf of BLS during the relevant time period. *Id.* ¶ 1(j). According to the indictment, from March 2006 to April 2013, BLS paid bribes to doctors practicing medicine in New Jersey and New York in exchange for the referral of blood specimens of their Medicare and private insurer patients for testing, using the funds generated by past blood specimen referrals to pay the bribes. *Id.* ¶¶ 2-3.

## I. The investigation and Medical Practice Subpoenas

In or around April 2013, the United States allegedly designated Defendant Greenspan a target in its investigation of the BLS bribery and kickback scheme. ECF No. 7-12 at 3. On or about April 9, 2013, the United States served the Medical Practice with two grand jury subpoenas related to the investigation. *Id.*; *see also* April 9, 2013 Subpoenas, Decl. Damian P.

2

NOT FOR PUBLICATION

Conforti in Supp. Def. Omnibus Mot., ECF No. 7-1 Ex. 1 (collectively, the "First Patient Records Subpoena"). The First Patient Records Subpoena sought production and authentication of the "complete medical file . . . . [f]or every patient regarding whom the Medical Practice either sent or referred blood specimens to, or had contract with [BLS] during the Period of January 1, 2006 through April 9, 2013, as well as the production and authentication of "any communication, notification, or mention of the Medical Practice's referral of patient blood specimens to BLS." ECF No. 7-12 at 3-4; ECF No. 7-1 Ex. 1.

Defendant Greenspan, the sole custodian of records for the Medical Practice, moved to quash the First Patient Records Subpoena on the grounds that the United States' requests were overbroad and that requiring him to appear before the grand jury in connection with the production of records would infringe upon his Fifth Amendment privilege against self-incrimination. ECF No. 7-12 at 4. Judge Stanley R. Chesler of this District of New Jersey issued an order denying the motion to quash and directing that a "qualified custodian of records of Bernard Greenspan, D.O., P.A. shall comply with the subpoena by physically producing the documents identified therein" to the grand jury within 30 days of the order. ECF No. 7-12 at 4; *see also* Order Denying Motion to Quash, *In re Grand Jury Empanelled on November 8, 2012*, No. 2:12-207 ("*Nov. Grand Jury*"), ECF No. 236 (D.N.J. Mar. 26, 2014), ECF No. 7-1 Ex. 2. Defendant Greenspan and the Medical Practice did not comply with the order, and the United States moved for an order to show cause seeking to hold Defendant Greenspan in civil contempt on May 12, 2014. ECF No. 7-12 at 4; *see also* Gov. Mot. Order to Show Cause, *Nov. Grand Jury*, ECF No. 270 (D.N.J. May 12, 2014), ECF No. 7-1 Ex. 3. Judge Chesler issued an order to show cause and set a hearing date for May 29, 2014. *Nov. Grand Jury*, ECF No. 277 (May 12, 2014). Defendant Greenspan cross-moved to stay any contempt sanctions pending his appeal of

NOT FOR PUBLICATION

Judge Chesler's denial of his motion to quash to the Third Circuit. ECF No. 7-12 at 4; *see also*

Def. Mot. Stay Enforcement, *Nov. Grand Jury*, ECF No. 280 (May 19, 2014), ECF No. 7-1 Ex.

4. Judge Chesler issued an order holding Defendant Greenspan in contempt on June 4, 2014.

ECF. No. 7-12 at 4; *see also* Contempt Order, *Nov. Grand Jury*, ECF No. 284 (June 4, 2014),

ECF No. 7-1 Ex. 5.

Defendant Greenspan filed a notice of appeal of the contempt order with the Third Circuit

on May 30, 2014. ECF No. 7-12 at 4; *see also* Notice of Appeal, *Nov. Grand Jury*, ECF No. 285

(May 30, 2014), ECF No. 7-1 Ex. 6. The Defendant also informed the United States, shortly

before filing his opening appellate brief, that the Medical Practice had "fallen on hard financial

times and fired all of its employees" other than him, hiring independent contractors in their

place. *In re Grand Jury Empaneled on May 9, 2014 ("May Grand Jury")*, 786 F.3d 255, 257 (3d

Cir. 2015). Before the Third Circuit heard oral argument on Defendant's motion, the United

States moved to vacate the contempt order because the May grand jury term had expired. ECF

No. 7-12 at 4; *see also In re Grand Jury Empaneled on November 8, 2012*, No. 14-2921, Mot.

Summary Action and Stay of Briefing (Sept. 10, 2014), ECF No. 7-1 Ex. 7.

The United States issued a new grand jury subpoena on September 10, 2014 (the "Second

Patient Records Subpoena"), also seeking the production and authentication of the "complete

medical file . . . . [f]or every patient regarding whom the Medical Practice either sent or referred

blood specimens to, or had contract with [BLS] during the Period of January 1, 2006 through

April 9, 2013," as well as the production and authentication of "any communication, notification,

or mention of the Medical Practice's referral of patient blood specimens to BLS." ECF No. 7-12

at 5; *see also* ECF No. 7-1 Ex. 8. Defendant challenged the subpoena again, and Judge Chesler

4

NOT FOR PUBLICATION

again denied his motion to quash and ordered Defendant Greenspan to comply with the subpoena and produce the documents before the grand jury. ECF No. 7-12 at 5.

On appeal, the Third Circuit affirmed the denial of Defendant's motion to quash the subpoena. *Id.*; *see also May Grand Jury*, 786 F.3d 255. The Third Circuit held that Defendant Greenspan could not rely on the Fifth Amendment privilege against self-incrimination simply because he was the sole employee and custodian of the Medical Practice. *May Grand Jury*, 786 F.3d at 258, 263. The Third Circuit rejected Defendant's argument that, because he has sole control over the location and content of Medical Practice business records, "a jury will inevitably conclude that he produced any incriminating documents," observing that it was "hard to imagine a jury 'inevitably' concluding that he produced the records when the records were created while the [Medical Practice] employed other staff besides [Defendant Greenspan] and while he utilizes the services of independent contractors whose responsibilities include maintaining accurate and complete medical records . . . and assisting with billing practices." *Id.* at at 261-63 (internal alterations and quotations omitted). The Third Circuit also affirmed Judge Chesler's holding that the Second Patient Records Subpoena was not overbroad and did not lack particularity. *Id.* at 263-64.

## II.   Defendant Greenspan's June 16, 2015 Grand Jury appearance

Defendant Greenspan appeared before the grand jury on June 16, 2015 in connection with the Second Patient Records Subpoena. ECF No. 7-12 at 7. Before Defendant Greenspan's appearance, the United States and Damian P. Conforti, counsel for Defendant, discussed exactly which documents Defendant was to produce in response to the Subpoena. On June 5, 2015, Conforti advised the United States that Defendant was prepared to produce approximately 300 boxes of documents, consisting of (a) "approximately 201 banker boxes of tens of thousands of

NOT FOR PUBLICATION

patient files," (b) "approximately 70 boxes of 'super bills,' each of which contains a daily log of patients and the orders and billing for services rendered to each patient treated on that particular day,' and (c) approximately 20 bankers boxes containing file folders of documents which are responsive to the requests other than the requests for patient files." ECF No. 7-12 at 6; *see also* June 5, 2015 email from Damian P. Conforti to Andrew Leven, ECF No. 7-1 Ex. 12 at 4.

Assistant United States Attorney Andrew Leven informed Conforti that the United States did "not want the entity to produce the patient files to the GJ at this time" but did "want to know on the record, from the custodian, about how many boxes of those patient files are responsive to the GJ subpoena" and 'be told by the custodian how many of the 200 or so boxes of patient files are responsive to the GJ subpoena." May 15, 2015 email from Andrew Leven to Damian P. Conforti, ECF No. 7-1 Ex. 12 at 2. AUSA Leven also instructed Defendant Greenspan to produce the "approximately 20 banker boxes containing file folders of documents which are responsive to the requests other than the requests for patient files" in "partial satisfaction of the subpoena" at the grand jury proceeding. June 8, 2015 email from Andrew Leven to Damian P. Conforti, ECF No. 7-1 Ex. 13. The United States claims that it instructed Defendant Greenspan not to produce the approximately 52,000 patient files identified by Greenspan to the grand jury because it was "[s]keptical that all 52,000 files were responsive to the subpoena." United States Mem. Opp. Def. Omnibus Motion, ECF No. 12 at 5.

In the grand jury on June 16, 2015, Defendant Greenspan did not authenticate the boxes of non-patient files that he had produced. ECF No. 7-12 at 7. Instead, the United States asked Defendant Greenspan about the approximately 52,000 patient files he had gathered in response to the Second Patient File Subpoena, inquiring whether he agreed that the Subpoena was "limited to patients whose blood was referred to Bio Diagnostic Laboratory Services for testing," *see*

NOT FOR PUBLICATION

Transcript, Grand Jury Proceedings of June 16, 2015, ECF No. 7-1 Ex. 15 at 13:4-7; whether "all 52,000 patients [were] individuals whose blood was referred by the Greenspan Medical Practice to what I'll short as BLS, the blood lab," *id.* at 13:18-22; "what percentage" of the patients "were actually referred by the Greenspan Medical Practice to Bio Diagnostic Laboratory Services," *id.* at 14:6-11; and whether "anybody, either [Defendant] or somebody acting under [Defendant's] direction, review[ed] those 52,000 patient files or any number of them to determine where the blood of that patient had been referred to." *Id.* at 19:15-19.

The United States did not advise Defendant Greenspan of his Fifth Amendment privilege against self-incrimination in the grand jury but did repeatedly state that Defendant was appearing in his "capacity as a representative of the Greenspan Medical Practice only and not in [his] individual capacity," *id.* at 8:20-23, advised Defendant of his right to consult with his attorney outside of the grand jury room during the proceedings, and warned Defendant that his statements were under oath and that he could face penalties for perjury or obstruction of justice for any false statements. *Id.* at 8:25-9:17.

After the first day of Defendant Greenspan's appearance before the grand jury, AUSA Leven clarified with Conforti that the prosecution's "immediate goal [had been] to receive the 17 boxes [of responsive non-patient file documents] in the GJ after being assured by the custodian that they do, in fact, represent all records responsive to" the requests in the Second Patient Records Subpoena, but that the parties "got stuck" in the grand jury on "Dr. Greenspan's inability (or unwillingness) to explain to the GJ what efforts he has undertaken directly, or through others, to locate and segregate, *all* responsive documents, including the patient files." June 16, 2015 email from Andrew Leven to Damian P. Conforti, ECF No. 7-1 Ex. 12 at 1-2 (emphasis in original).

NOT FOR PUBLICATION

### III.    Defendant Greenspan's June 30, 2015 and March 8, 2016 Grand Jury appearances

Defendant Greenspan appeared before the grand jury two more times. On June 30, 2015, Defendant authenticated non-patient documents. See Transcript, Grand Jury Proceedings of June 30, 2015, ECF No. 7-1 Ex. 16. On March 8, 2016, Defendant confirmed production of responsive patient files on a file-by-file basis. *See,* e.g., Transcript, Grand Jury Proceedings of March 8, 2016, ECF No. 7-1 Ex. 17 at 15:11-16:1. In both proceedings, the United States repeatedly stated that Defendant was appearing in his capacity as a representative of the Medical Practice and not in his personal capacity, advised Defendant of his right to consult with his attorney outside of the grand jury room during the proceedings, and warned Defendant that his statements were under oath and that he could face penalties for perjury or obstruction of justice for any false statements. ECF No. 7-1 Ex. 16 at 5:6-6:11; ECF No. 7-1 Ex. 17 at 5:16-6:18. In the June 30, 2015 proceeding, the United States also advised Defendant Greenspan that "every statement made by you is under oath, is being taken down by a court reporter, and could be used against you in a later proceeding if it were willfully untrue." ECF No. 7-1 Ex. 16 at 6:1-4. In the March 8, 2016 proceeding, the United States advised Defendant that "you now have the right to decline to answer any question where you feel answers may tend to incriminate you." ECF No. 7-1 Ex. 17 at 5:20-22.

### IV.    The Indictment

On March 8, 2016, the grand jury returned a ten-count indictment charging Defendant Greenspan with various offenses in connection with his alleged participation in the BLS bribery and kickback scheme. ECF No. 1. Count One charges Defendant with conspiracy to violate the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(A), and Travel Act, 18 U.S.C. 1952(a)(1) and (3), and to defraud patients of honest services, in violation of 18 U.S.C. §§ 1343,

NOT FOR PUBLICATION

1346, all in violation of 18 U.S.C. ¶ 371. *Id.* ¶¶ 1-11. The indictment alleges that, from at least as

early as March 2006 through April 2013, in the District of New Jersey and elsewhere, Defendant

knowingly and intentionally conspired with David Nicoll, Scott Nicoll, Nordman, Dailey, and

others associated with BLS to: (1) willfully solicit and receive kickbacks and bribes from BLS in

order to induce Defendant to refer the blood specimens of his Medicare and privately insured

patients to BLS for testing, *id.* ¶ 8(a); (2) knowingly and intentionally travel in interstate

commerce and use the mail to carry out these unlawful activities, *id.* ¶ 8(b); and (3) knowingly

and intentionally devise a scheme to defraud Defendant's patients of their right to his honest

services as their physician, and to use interstate wire, radio, and television communication in

furtherance of this scheme. *Id.* ¶ 8(c). Specifically, the indictment alleges that, over certain

periods of time, Defendant Greenspan accepted "rent" checks of approximately $2,000 to $2,500

per month, "service agreement" checks of approximately $720 to $1,750 per month, "consulting

agreement" checks of $1,500 per month, fee-per-test cash bribes, and payment for office holiday

parties from his co-conspirators in exchange for his referral of patient blood specimens to BLS.

*Id.* ¶ 10(a)-(f). In response to a request from Defendant, BLS also allegedly agreed to hire and

employ a patient of Defendant with whom he was having sexual relations. *Id.* ¶ 10(g).

The indictment alleges that Defendant Greenspan took several overt actions in

furtherance of the conspiracy, including: (1) accepting $1,500 "consulting agreement" checks

from Advantech as bribes for the referral of patient blood samples, leading BLS on several

occasions to bill and receive payments for Medicare, in July 2011, *id.* ¶ 11(a)-(d), September

2011, *id.* ¶ 11(e)-(g), April 2012, *id.* ¶ 11(n)-(q), May 2012, *id.* ¶ 11(r)-(w), and September 2012,

*id.* ¶ 11(x)-(bb); (2) accepting monthly bribe payments hand delivered by Craig Nordman in

exchange for the same actions on December 7, 2011, *id.* ¶ 11(i), and December 4, 2012, *id.* ¶

NOT FOR PUBLICATION

11(cc)-(ee); and (3) accepting BLS's payment for his office holiday parties at the Capital Grille in Paramus, New Jersey as a bribe for the referral of patient blood samples in December 2011, *id.* ¶ 11(h)-(n), and December 2012, *id.* ¶ 11(ff)-(hh).

Counts Two through Four charge Defendant Greenspan with illegal renumeration in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(1)(A) and 18 U.S.C. § 2, incorporating the conspiracy allegations and specifically alleging that Defendant accepted kickbacks and bribes in return for the referral of patient blood samples on July 13, 2011 (Count Two), December 14, 2011 (Count Three), and December 12, 2012 (Count Four). *Id.* ¶¶ 1-2.

Counts Five through Seven charge Defendant Greenspan with knowingly traveling in and using the mail and facilities or causing travel in or use of the mail and facilities in interstate commerce to commit commercial bribery, as defined by N.J.S.A. 2C:21-10, in violation of 18 U.S.C. §§ 1952(a)(1) and (3) and 18 U.S.C. § 2. *Id.* ¶¶ 1-2. Counts Five through Seven incorporate the conspiracy allegations and specifically allege that BLS received approximately $300 via an interstate bank wire from Medicare on August 11, 2011 for blood tests ordered by Defendant after he accepted the July 2011 "consulting agreement" check, *see id.* ¶ 11(d) (Count Five); that Craig Nordman sent a text message to Defendant reading "Your party is confirmed!" on December 7, 2011 in connection with Defendant's request that BLS pay for his office holiday party, *see id.* ¶ 11(j) (Count Six); and that Nordman sent a text message to Defendant reading "On my way. 20 min away" on December 4, 2012 in connection with Nordman's hand delivery of a "consulting agreement" bribe check, *see id.* ¶ 11(cc) (Count Seven). *Id.* ¶¶ 1-2.

Counts Eight through Ten charge Defendant Greenspan with knowingly devising a scheme to defraud his patients of their right to his honest services as a physician, including his duty to refrain from seeking and receiving bribes and kickbacks in exchange for his actions as

NOT FOR PUBLICATION

their physician, in violation of 18 U.S.C. §§ 1343, 1346, and 18 U.S.C. § 2. *Id.* ¶¶ 1-5. Counts

Eight through Ten incorporate the conspiracy allegations and specifically allege that, as part of

the scheme to defraud, Defendant caused Medicare to make payments to BLS via interstate wire

for blood tests unlawfully referred by Defendant on May 18, 2012, *see id.* ¶ 11(u) (Count Eight);

June 14, 2012, *see id.* ¶ 11(w) (Count Nine); and October 18, 2012, *see id.* ¶ 11(bb). *Id.* ¶¶ 5.

The indictment also seeks forfeiture of all assets derived from Defendant Greenspan's

alleged offenses.

## V.    Defendant's omnibus motion

On June 6, 2016, Defendant Greenspan filed an omnibus motion in this Court seeking

various forms of relief. ECF No. 7. Defendant seeks an order (1) dismissing the indictment in its

entirety for violations of his Fifth Amendment privilege against self-incrimination in the grand

jury proceedings, (2) dismissing the conspiracy to violate the Federal Anti-Kickback Statute

charge in Count One and Federal Anti-Kickback violations charged in Counts Two through Four

for failure to allege overt acts before 2011 and failure to acknowledge that BLS was temporarily

unable to participate in the Medicare program; (3) dismissing the conspiracy to violate the Travel

Act charge in Count One and travel Act violations charged in Counts Five through Seven

because the New Jersey bribery statute that serves as a predicate for the charges is impermissibly

vague; (4) dismissing the conspiracy to defraud patients of honest services charged in Count One

and Honest Services Fraud charges in Counts Eight through Ten because the federal Honest

Services Fraud statute is impermissibly vague; (5) requiring the United States to make immediate

disclosure of all *Brady* material and early disclosure of Jencks Act and *Giglio* material; (6)

permitting Defendant to issue subpoenas *duces tecum* in preparation of his defense; and (6)

permitting Defendant to file additional motions before trial. *Id.* The United States filed a brief in

NOT FOR PUBLICATION

opposition to Defendant's motion on June 30, 2016. ECF No. 12. Defendant filed a reply brief in further support of his motion on July 11, 2016. ECF No. 13.

## STANDARD OF REVIEW

### I.   Motion to dismiss for error in the grand jury proceeding

The Fifth Amendment of the Constitution requires that an indictment be returned by a legally constituted and unbiased grand jury. *Lawn v. United States*, 355 U.S. 339, 349-50 (1958); *Costello v. United States*, 350 U.S. 359, 363 (1956); *United States v. Serubo*, 604 F.2d 807, 816 (3d Cir. 1979). Federal Rule of Criminal Procedure 12(b)(3)(A)(v) allows a defendant to move to dismiss an indictment based on an "error in the grand-jury proceeding or preliminary hearing." Fed. R. Crim. P. 12(b)(3)(A)(v). Federal Rule of Criminal Procedure 6(b)(2) allows a defendant to move to dismiss an indictment "based on an objection to the grand jury or on an individual juror's lack of qualification." Fed. R. Crim. P. 6(b)(2). Courts also have the power to dismiss an indictment based on prosecutorial misconduct in the grand jury proceedings, though "this power is limited." *United States v. Breslin*, 916 F. Supp. 438, 441 (E.D. Pa. 1996).

Dismissal of an indictment is "the most drastic remedy," *United States v. Bansal*, 663 F.3d 634, 660 (3d Cir. 2011) (quoting *United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981)), "In the absence of fundamental errors such as racial or gender discrimination in the selection of the jurors, a harmless error inquiry applies to claims of prosecutorial misconduct before the grand jury." *United States v. Davis*, 2003 WL 1064892, at *1 (E.D. Pa. Mar. 10, 2003). A defendant who seeks dismissal of an indictment must show that errors in the grand jury proceeding "caused actual prejudice to the defendant." *Id*. (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (an indictment should only be dismissed "if it is established that the violation substantially influenced the grand jury's decision to indict, of it there is grave doubt

NOT FOR PUBLICATION

that the decision to indict was free from the substantial influence of such violations.") (internal quotations omitted)).

## II.   Motion to dismiss for failure to state an offense

Federal Rule of Criminal Procedure 12(b)(3) allows a defendant to move to dismiss an indictment for a failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). An "indictment is sufficient when it (1) contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet, and (2) allows him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. John-Baptiste*, 747 F.3d 186, 195 (3d Cir. 2014) (internal citations and quotations omitted). Under Fed. R. Crim. P. 12(b)(3)(B), "a defendant may contest the sufficiency of an indictment on the basis that it 'fails . . . to state an offense' in at least two ways." *United States v. Stock*, 728 F.3d 287, 292 (3d Cir. 2013). First, "a defendant may contend that an indictment is insufficient on the basis that it . . . 'fails to charge an essential element of the crime.'" *Id.* (quoting *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). Second, a defendant may "claim that an indictment fails to state an offense on the basis that 'the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.'" *Id.* (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002)).

For purposes of a motion to dismiss, the Court must accept as true all factual allegations in the indictment. *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "[C]riminal indictments are to be read as a whole and interpreted in a common sense manner," *United States v. Lee*, 359 F.3d 194, 209 (3d Cir. 2004) (quotations omitted), and dismissal under Rule 12(b)(3) "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges." *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000).

13

NOT FOR PUBLICATION

DISCUSSION

I. **The United States did not violate Defendant's Fifth Amendment rights in the Grand Jury proceeding on June 16, 2015**

Defendant argues that the entire indictment must be dismissed because the United States improperly compelled him to provide more than "testimony auxiliary to the production" of the subpoenaed patient records in violation of his Fifth Amendment privilege against self-incrimination. ECF No. 7-12 at 25. Defendant claims that the United States instead "use[d] his appearance before the Grand Jury as the custodian of records for the Medical Practice to substantiate its claims against him," *id*. at 21, by repeatedly questioning Defendant whether the subpoenaed Patient Records belonged to patients whose blood samples were "referred" to BLS, an "essential element . . . of the charges asserted against him." *Id*. at 25. The Court disagrees.

**A. Applicable Law**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege protects individuals from being compelled to provide testimonial communications that may incriminate them, including the compelled production of personal records. *See*, e.g., *Bellis v. United States*, 417 U.S. 85, 87 (1974) ("It has long been established, of course, that the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony."). Under the "collective entity" doctrine, however, individual custodians of records may not invoke the Fifth Amendment to avoid producing documents of a collective entity, even where production of those documents might be personally incriminating. *Braswell v. United States*, 487 U.S. 99, 105-13 (1988). In *May Grand Jury*, the Third Circuit followed the First, Second, and Fourth Circuits and held

14

NOT FOR PUBLICATION

definitively that the collective entity doctrine barred Defendant Greenspan from invoking the

Fifth Amendment to avoid producing Medical Practice records, even though he was the sole

owner and employee of the Medical Practice at the time of production. 786 F.3d at 262-63 (citing

*In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 158-59 (2d Cir. 2010); *Amato v.*

*United States*, 450 F.3d 46, 53 (1st Cir. 2006); *United States v. Stone*, 976 F.2d 909, 912 (4th

Cir. 1992); *cert. denied*, 507 U.S. 1029 (1993)). Implicit in the collective entity doctrine is the

government's power to require "testimony auxiliary to the production" of custodial records, *In re*

*Grand Jury Empaneled on April 6, 1993 ("April 6 Grand Jury")*, 869 F. Supp. 298, 302 (D.N.J.

1994) (quoting *United States v. Austin-Bagley Corp.*, 31 F.2d 229, 234 (2d Cir. 1929)), including

the identification or authentication of documents for admission in evidence, since this "merely

makes explicit what is implicit in the production itself." *Id.* (quoting *Curcio v. United States*, 354

U.S. 118, 125 (1957)).

The collective entity doctrine does not allow the government to directly use a custodian's

grand jury testimony to prosecute him individually. Because "certain consequences flow from

the face that the custodian's act of production is one in his representative rather than personal

capacity," *id.* (quoting *Braswell*, 487 U.S. at 117), the government is "prohibited from making

any evidentiary use of the 'individual act' [of production] against the custodian" in a subsequent

criminal proceeding against the custodian. *Id.* "This is because when the custodian produces

documents pursuant to a subpoena issued to the corporation, he or she acts as a representative,

and the act is deemed on of the corporation, not the individual." *Id.* (citing *Braswell*, 487 U.S. at

118).

Nor does the collective entity doctrine allow the government to compel a custodian "to do

more than identify [the] documents already produced." *United States v. Dianonio*, 2016 WL

NOT FOR PUBLICATION

3063808, at *6 (D.N.J. May 27, 2016) (quoting *Curcio*, 354 U.S. at 125); *see also Braswell*, 487 U.S. at 114 (Fifth Amendment does not protect a corporate officer from being required to "produce corporate records *and merely identify them*") (emphasis added). At least one court in this District has held that "[c]ompelling [a] respondent to provide oral testimony about how [corporate records] were created, maintained, and circulated by officers and employees is different in kind, and potentially independently incriminating, from producing the documents and testifying that they are those records called for by the subpoena." *April 6 Grand Jury*, 869 F. Supp. at 306.

### B.  Analysis

#### 1.  The United States permissibly sought "testimony auxiliary to the production" of the subpoenaed patient records

Defendant is correct that AUSA Leven repeatedly questioned him during the June 16, 2015 grand jury proceeding about whether the "52,000 patient files" Defendant reported compiling, ECF No. 7-1 Ex. 15 at 10:20-23, were those of patients whose blood samples were "sent" or "referred" to BLS for testing. *See* ECF No. 7-12 at 7-10 (citing grand jury transcript). These questions were within the permissible scope of questioning about custodial records and did not violate Defendant's Fifth Amendment rights.

To repeat, the Second Patient File Subpoena sought, among other items, the "complete medical file . . . . [f]or every patient regarding whom the Medical Practice either sent or referred blood specimens to, or had contract with [BLS] during the Period of January 1, 2006 through April 9, 2013." ECF No. 7-1 Ex. 8. The Subpoena did *not* seek the medical files of patients whose blood specimens were not sent or referred to BLS.

NOT FOR PUBLICATION

A review of the transcript of the June 16, 2015 grand jury proceeding demonstrates that AUSA Leven's allegedly "incessant" questioning about whether the 52,000 patient files had been "referred" or "sent" to BLS, ECF No. 7-12 at 8, was simply an extended, labored attempt to confirm with Defendant, in his capacity as custodian of records for the Medical Practice, whether the patient files were actually responsive to the Second Patient File Subpoena. AUSA Leven explained to Defendant that "the grand jury subpoena requires the entity that you are here representing to produce documents as described" in the Subpoena, ECF No. 7-1 Ex. 15 at 16:23-25, and that the Subpoena "says if a patient has been – had their blood referred to BLS, that is a responsive document to the grand jury subpoena." *Id.* at 17:5-7. AUSA Leven asked Defendant whether he had made a "good-faith effort as the custodian of records to comply with the terms of this subpoena." *Id.* at 18:19-21

Defendant Greenspan indicated early in the grand jury proceeding that "[a]bsolutely not" all of the 52,000 patients were "individuals whose blood was referred by the Greenspan Medical Practice" to BLS. *Id.* 13:20-23. AUSA Leven then repeatedly attempted to ascertain whether Defendant could "give us a rough estimate of the percentage of the 52,000 patients you mentioned earlier whose blood was actually referred to Bio Diagnostic Laboratory Services," *id.* at 15:11-14, and whether Defendant or any other qualified individual had reviewed the patient files to determine whether *any* of them were responsive to the Subpoena. *See id.* at 17:9-12 ("So in the context of responding to the grand jury subpoena, which is an order of the United States District Court, do you understand that the records have to actually be looked at to see if they're responsive or not, don't you?"); *id.* at 20:10-11 ("[W]hat we're trying to discover, really, are the efforts made to comply with this grand jury subpoena."); *id.* at 33:4-8 ("[B]ased upon your testimony today by all appearances, the entity has not yet taken the basic steps required to

17

NOT FOR PUBLICATION

comply with the grand jury subpoena . . . . By your testimony, it is this grand jury's understanding that none of the 52,000 patient files have been reviewed to see if the blood of any of those 52,000 patients was sent to BLS for testing . . . ."); *id.* at 34:2-4 (Question: "Have you reviewed any of those 52,000 patient files for purposes of complying with this grand jury subpoena?" Response: "I have not.").

Defendant relies largely on *April 6 Grand Jury* to argue that the United States overreached in its questioning by asking Defendant to provide testimony with an "incriminating tendency." 869 F. Supp. at 308 (quoting *Haner v. United States*, 440 U.S. 1308, 1309 (1979)). Defendant claims that the United States "was confined to authenticating the records through Dr. Greenspan by confirming only (i) 'the location of the documents produced' and that (ii) 'the produced records are those called for by the subpoena.'" ECF No. 7-12 at 25 (quoting *April 6 Grand Jury*, 869 F. Supp. at 303-04). As explained, this is precisely what the United States sought to confirm.

The Court recognizes that Defendant raises a difficult issue. The court in *April 6 Grand Jury* held that questions "regarding the conduct of the corporation at the time the subpoenaed records were created," unlike questions about whether the produced records are responsive to a subpoena, may violate the Fifth Amendment because "[s]uch testimony may require a custodian to divulge personal knowledge of the type of business conducted and the routine practices of the corporation." 869 F. Supp. at 304. Here the conduct of the Medical Practice at the time the records were created, *i.e.* whether the patient blood samples were referred to BLS, determined whether or not the records were responsive to the Second Patient Records Subpoena.

That the potential responsiveness of patient records derived from the Medical Practice's allegedly incriminating conduct, however, does not alter the Court's analysis. As discussed, the

NOT FOR PUBLICATION

Third Circuit held that the Second Patient File Subpoena, and Judge Chesler's order that a custodian of records appear in the grand jury to produce the requested patient files, did not violate Defendant's Fifth Amendment rights. *May Grand Jury*, 786 F.3d at 258-63. The Court also "recognized that compelled production of documents can be testimonial to the extent the production communicates statements of fact" but rejected Defendant's argument that, "because the Government's document requests require him, as custodian, to identify sources of information, the document requests are more akin to an interrogatory or oral deposition." *Id.* at 263 n.2 (citing *United States v. Hubell*, 530 U.S. 27, 36 (2000); *Braswell*, 487 U.S. at 112). The allegedly incriminating nature of the responsive patient files did not render questions about whether any of the 52,000 total files were responsive impermissible.

Defendant's observation that the United States did not ask similarly detailed questions in the grand jury proceedings on June 30, 2015 and March 18, 2016, ECF No. 7-12 at 11-13, is correct, but this does not demonstrate an error in the June 16, 2015 proceeding. To repeat, the United States asked detailed questions in the June 16, 2015 proceeding in order to determine if the 52,000 patient files were responsive to the Subpoena. At the end of the June 16, 2015 proceeding, AUSA Leven asked the forewoman of the grand jury to instruct Defendant to "go back and comply with the grand jury subpoena by causing, among other things by causing those files to be reviewed." ECF No. 7-1 Ex. 15 at 34: 14-17. The United States explains that, after the June 16, 2015 proceeding, counsel for Defendant and the United States communicated out of court about the production of responsive files. On February 1, 2016, the United States sent Defendant's counsel a list of 121 specific patient files that it would accept in satisfaction of the files demanded by the Second Patient File Subpoena, and Defendant produced those files. ECF No. 12 at 12-13. The United States had no need to ask Defendant in the latter two proceedings

NOT FOR PUBLICATION

about whether the files at issue involved blood tests "referred" to BLS because – unlike in the June 16, 2015 proceeding – Defendant had already answered the question out of court.

### 2. Defendant Greenspan was not required to testify in his personal capacity

To the extent Defendant Greenspan argues that AUSA Leven's questions required him to provide not only information about the Medical Practice's conduct, but his *own* conduct, the Court disagrees.

As an initial matter, AUSA Leven repeatedly reminded Defendant that he was testifying in his "capacity as a representative of the Greenspan Medical Practice Only and not in [his] individual capacity," ECF No. 12-1 Ex. 15 at 9:20-23; "only as custodian of records and not in [his] individual capacity," *id.* at 10:10-11; "as the custodian of records for the Greenspan Medical Practice," *id.* at 12:23-24; as "custodian of records," 16:20; and "in his capacity as custodian of records," not in his "capacity as Bernard Greenspan, M.D. or D.O." *Id.* at 22:3-5.

It does appear that Defendant Greenspan responded to several questions by attempting to offer testimony about his personal actions. But the "mere fact that a witness cannot be *compelled* to answer a question that would incriminate him does not mean that merely asking the question is necessarily improper." *Diantonio*, 2016 WL 3063808, at *7 (internal alterations omitted). Similarly, that Defendant responded to statements about his actions as custodian of records with statements about his personal actions does not mean that the questions were improper. In any event, AUSA Leven specifically reminded Defendant after these statements that he did *not* want Defendant to testify about his personal activities. Defendant responded to a question about whether "one way to determine if a patient's blood had been referred to BLS [would] be to open up the file and see which lab generated the report for the blood work" by explaining that "I would never focus on the lab that it came from, only the results." *Id.* at 16:15-19. AUSA Leven

20

NOT FOR PUBLICATION

reminded Defendant, "Doctor, you're here at [sic] the custodian of records, right?" *Id.* at 16:20-21. Later, when Defendant objected to AUSA Leven's use of the term "referral," stating that, "I never referred blood to any specific laboratory. I ordered blood tests," *id.* at 21:22-24, AUSA Leven further clarified that he was "not asking nor do I want you to give me details about your activities as a physician. I'm asking about your activities as custodian of records." *Id.* at 22:5-8. These exchanges do not demonstrate a violation of Defendant's Fifth Amendment rights.

Defendant also relies on the concurrence of Judge Becker *In re Grand Jury Matter (Brown)*, 786 F.2d 525 (3d Cir. 1985) to argue that production of subpoenaed documents that require a custodian to answer the question, "Did you prepare the documents?" would "consequently convey implied and probably incriminatory testimony by [the custodian] that he had prepared, or had supervised the preparation of, the documents produced." ECF No. 7-12 at 23 (quoting *Brown*, 786 F.2d at 531). This was not the holding in *Brown*, and the Court is not bound by a concurrence. In any event, the Third Circuit held in *May Grand Jury* that, to the extent the majority in *Brown* made "the communicative or noncommunicative nature of the arguably incriminating disclosures sought to be compelled" a "significant factor" in Fifth Amendment analysis, this test was overruled by the Supreme Court in *Braswell*. *May Grand Jury*, 786 F.3d at 262 (quoting *Braswell*, 487 U.S. at 109). The Court echoes the Third Circuit's observation that Defendant's mere act of production of the files, in his capacity as custodian of records, was not inherently personally incriminating. It "is hard to imagine a jury 'inevitably' concluding that [Defendant Greenspan] produced the records when the records were created while the Corporation employed other staff besides [Greenspan] and while he utilizes the services of independent contractors whose responsibilities include" maintaining medical records.

NOT FOR PUBLICATION

*May Grand Jury*, 876 F.3d at 261-62. As the Court will discuss, any statements Defendant made about his personal creation of the patient records was not compelled.

### 3.  Defendant was not "compelled" to give testimony

Even if the United States *had* sought personally incriminating testimony from Defendant Greenspan, he does not actually allege that the United States compelled him to provide testimony. "[T]he upshot of the Supreme Court's jurisprudence in the context of document custodian examination reveals the malady is not in the examination of custodians (even those under individual investigation), but rather in the *compulsion* of an answer to questions in contravention of the invocation of the Fifth Amendment." *Diantonio*, 2016 WL 3063808, at *7 (emphasis in original) (citing *Curcio*, 354 U.S. at 126). Defendant did not invoke his privilege against self-incrimination at any point during the June 16, 2015 proceeding.

Defendant argues that the United States engaged in prosecutorial misconduct (or otherwise erred) because AUSA Leven "never once advised Dr. Greenspan of *any* of his Fifth Amendment rights, or warned him that his recorded testimony could be later used against him." ECF No. 7-12 at 7 (emphasis in original). As an initial matter, this statement is not entirely correct. AUSA Leven specifically advised Defendant of the nature of the grand jury investigation, ECF No. 7-1 Ex. 15 at 8:15-18, Defendant's right to consult his attorney during the proceeding, *id*. at 8:25-9:3, that Defendant was under oath and that his statements were being recorded, *id*. at 9:10-13, and that false, misleading, or incomplete statements could subject Defendant to charges for perjury or obstruction of justice. *Id*. at 9:13-17. Defendant confirmed his understanding of these disclaimers and demonstrated his understanding by consulting with his attorney several times during the proceeding, including once before AUSA Leven informed him of his right to do so. *See id*. at 5:8-12.

22

NOT FOR PUBLICATION

Defendant is correct that the United States did not specifically warn him of his Fifth Amendment privilege against self-incrimination. But "it is unclear that such a warning is ever necessary" in a grand jury proceeding. *Diantonio*, 2016 WL 3063808, at *3 n.3 (citing *United States v. Washington*, 431 U.S. 181, 186 (1977) ("[N]or have we decided whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses.")). In any event, the Court is highly skeptical that Defendant was unaware of his privilege against self-incrimination after appealing the issue to the Third Circuit twice before the June 16, 2016 proceeding and consulting with counsel several times throughout the proceeding.

### 4.  Defendant does not demonstrate any "actual prejudice"

Even if the United States had violated Defendant's Fifth Amendment rights by compelling him to provide personally incriminating testimony not auxiliary to the production of the subpoenaed corporate records, Defendant does not meet his burden to demonstrate that any such error "caused actual prejudice to the defendant." *Bank of Nova Scotia*, 487 U.S. at 256.

Defendant is correct that the indictment charges him with offenses that involve the "referral" of blood specimens to BLS for testing. ECF No. 7-12 at 14-16. But Defendant provides no indication that the grand jury's decision to indict was "substantially influenced" by AUSA Leven's questions or his answers during the June 16, 2015 proceeding, and not by the allegedly inculpatory patient records themselves. *Bank of Nova Scotia*, 487 U.S. at 256. The Court finds that Defendant has not met his burden to demonstrate that any error in the grand jury proceeding was not harmless. Defendant's motion to dismiss the indictment in its entirety is denied. The Court repeats that United States may not use Defendant's individual act of production against him at trial, *Braswell*, 487 U.S. at 118. This is a separate issue from whether errors in the grand jury proceeding require dismissal of the indictment.

NOT FOR PUBLICATION

## II.    The indictment adequately alleges violations of the Anti-Kickback Statute and a conspiracy to violate the Anti-Kickback Statute

Defendant Greenspan argues that the Court must dismiss the conspiracy to violate the Federal Anti-Kickback Statute charge in Count One and Federal Anti-Kickback Statute violations charged in Counts Two through Four of the indictment because (a) BLS was ineligible to receive Medicare payments between 2009 and 2011, and (b) the indictment does not allege any "overt acts" that occurred before July 5, 2013. Neither of these arguments is availing.

### A.  Applicable Law

"The elements of an Anti-Kickback Statute violation are that the defendant (1) "knowingly and willfully"; (2) "solicit[ed] or receive[d] any renumeration" (3) "in return for referring an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program." *United States v. Goldman*, 607 Fed App'x 171, 174-74 (3d Cir. 2015) (quoting 42 U.S.C. § 1320a-7b(b)(1)(A)). A "federal health care program" is defined as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funding directly, in whole or in part, by the United States Government." 42 U.S.C. § 1320a-7b(f).

"An indictment charging a conspiracy under 18 U.S.C. § 371 need not specifically plead all of the elements of the underlying substantive offense." *United States v. Werme*, 939 F.2d 108, 112 (3d Cir. 1991). A charge of conspiracy to violate the Anti-Kickback Statute requires the United States to demonstrate that "a conspiracy was formed with the purpose of violating the anti-kickback statute, that [the defendant] willfully and knowingly joined the conspiracy and, that one or more of the conspirators performed an overt at in furtherance of the conspiracy."

NOT FOR PUBLICATION

*United States v. Picciotti*, 40 F. Supp. 2d 242, 249 (D.N.J. 1999) (citing *United States v.*

*Uzzolino*, 651 F.2d 207, 214 n.13 (3d Cir. 1981)).

### B. Analysis

#### 1. Defendant's Medicare ineligibility argument is an issue of fact for trial

The indictment adequately alleges the elements of the three Anti-Kickback violations and

conspiracy to violation the Anti-Kickback Statute. Count Two alleges that Defendant Greenspan

received a kickback/bribe on July 13, 2011 in return for the referral of blood tests to BLS for

which payment was made, in whole or in part, under the Medicare program. ECF No. 1 ¶¶ 1, 2.

Count Three alleges that Defendant received a kickback/bribe on December 14, 2011 in return

for the referral of blood tests to BLS for which payment was made, in whole or in part, under the

Medicare program. *Id*. Count Four alleges that Defendant received a kickback/bribe on

December 12, 2012 in return for the referral of blood tests to BLS for which payment was made,

in whole or in part, under the Medicare program. *Id*. Counts Two through Four incorporate the

factual allegations of Count One, the conspiracy charge: the indictment specifically identifies the

bribe alleged in Count Two as a $1,500 "consulting agreement" bribe from Advantech deposited

in a bank account held in the name of Dr. Greenspan DO PA, alleges that Defendant caused

blood tests to be referred to BLS on July 13, 2011, and alleges that BLS received a wire of

approximately $300 from Medicare as payment for the blood tests on August 11, 2011, *id*. ¶

11(b)-(d); identifies the bribe alleged in Count Three as payment for a holiday party for

Defendant's office staff at the Capital Grille in Paramus, New Jersey on December 14, 2011, and

alleges that Defendant caused blood tests to be referred to BLS on December 15 and December

17, 2011, *id*. ¶ 11(k)-(m); and identifies the bribe alleged in Count Four as payment from BLS

for a holiday party for his office staff at the Capital Grille in Paramus, New Jersey on December

NOT FOR PUBLICATION

12, 2012, and alleges that Defendant caused a blood test to be referred to BLS on December 15, 2012. *Id.* ¶ 11(ff)-(hh).

Defendant argues that the indictment "fails to account for" an "extensive period during which BLS' enrollment in the Medicare program was revoked," referencing a March 5, 2010 letter from Highmark Medicare Services to BLS about the "imposition of a 2-year re-enrollment bar." ECF No. 7-12 at 17; *see also* Highmark Medicare Services Letter, ECF No. 7-1 Ex. 19 at 1-2. Defendant claims he could not have violated the Anti-Kickback Statute during this period because BLS was ineligible to receive payment from a "federal health care program." *Id.* Defendant does not specify the exact dates of BLS's alleged period of Medicare ineligibility, however, and he does not specifically argue that the bribes and blood tests alleged in Counts Two through Four occurred during this period. In any event, this Court's "review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged." *United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012). The indictment alleges that Defendant received bribes or kickbacks on July 13, 2011, December 14, 2011, and December 12, 2012 in exchange for the referral of blood tests for which BLS received Medicare payments. Whether BLS actually received Medicare payments for these tests is an issue of fact for a jury to determine, not an issue for the Court to decide on a motion to dismiss.

## 2. The indictment adequately alleges a conspiracy to violate the Anti-Kickback Statute between March 2006 and April 2013.

The Court also denies Defendant's claim that the indictment contains an impermissible "gaping hole" during the first five years of the alleged Anti-Kickback Statute conspiracy. ECF No. 7-12 at 18. Defendant is correct that Count One of the indictment charges him, in part, with

NOT FOR PUBLICATION

participating in a conspiracy to violate the Anti-Kickback Statute between March 2006 and April 2013. *See* ECF No. 1 ¶ 2. The indictment alleges that, "at least as early as in or about March 2006," Defendant agreed with one or more persons acting on behalf of BLS to refer the blood samples of his Medicare patients in exchange for monthly bribe payments, *id.* ¶ 5, that he did accept bribes in exchange for blood test referrals, *id.* ¶ 6, and that his referrals enabled BLS to collect more than $3,000,000 from Medicare and private insurers. *Id.* ¶ 7.

Defendant is also correct that the first "overt act" charged in the indictment in furtherance of the alleged Anti-Kickback Statute violation conspiracy occurred on July 5, 2011. *See id.* ¶ 11(a). This is enough to support the conspiracy charge, which requires only that the indictment allege "*an* overt act in furtherance of the conspiracy." *Picciotti*, 40 F. Supp. 2d at 249 (emphasis added). The indictment need not allege a specific overt act on each day of the conspiracy; it is enough that Defendant allegedly agreed with BLS to engage in a conspiracy to violate the anti-kickback statute beginning in March 2006 and that Defendant engaged in an overt act at some point over the course of the conspiracy. Whether the conspiracy *actually* began in 2006 is an issue of fact for trial. Defendant's motion to dismiss the conspiracy to violate the Anti-Kickback Statute charge in Count One, and the Anti-Kickback Statute violations in Counts Two, Three, and Four is denied.

**III.   The indictment adequately alleges violations of the Travel Act and a conspiracy to violate the Travel Act**

Defendant argues the Travel Act violations charged in Counts Five through Seven of the indictment and the conspiracy to violate the Travel Act charged in Count One are "nothing more than a veiled attempt by the Government to add volume – but not substance to its case" and "bear no relation to the alleged wrongful acts" of Defendant. ECF No. 7-12 at 28. Defendant claims

NOT FOR PUBLICATION

that the New Jersey Bribery Statute that serves as a predicate for the Travel Act charges does not provide "fair warning" that Defendant's conduct was unlawful because it does not define the "duty of fidelity" to Defendant's patients that he allegedly violated. N.J.S.A. 2C:21-10. The Court disagrees.

### A. Applicable Law

Under the due process clause of the Fifth Amendment, a defendant charged with a statutory offense must have "fair warning" that his actions violate the statute. *United States v. Lanier*, 520 U.S. 259, 266 (1997). The underlying "principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.* (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). "There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). A criminal statute is "void on vagueness grounds if it: (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2) authorizes or even encourages arbitrary and discriminatory enforcement. The inquiry is undertaken on a case-by-case basis, and a reviewing court must determine whether the statute is vague as-applied to the affected party." *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009) (internal citations and quotation marks omitted). Second, "the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Lanier*, 520 U.S. at 266 (citing, e.g., *Liparota v. United States*, 471 U.S. 419, 427 (1985)). Third, "due process bars courts from applying a novel construction of a criminal

NOT FOR PUBLICATION

statute that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," although clarity "may be supplied by judicial gloss on an otherwise uncertain statute." *Id.* (citations omitted).

The Travel Act makes it unlawful for anyone to "travel[ ] in interstate or foreign commerce or use[ ] the mail or any facility in interstate or foreign commerce, with intent to (1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a). The indictment charges Defendant Greenspan with violating the Travel Act by traveling in interstate commerce and using the mail and facilities of interstate commerce in furtherance of acts of commercial bribery, in violation of the New Jersey Bribery Statute, N.J.S.A. § 2C:21-10. The New Jersey Bribery Statute provides, in part, that a "person commits a crime if he solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity to which he is subject as . . . a . . . physician." N.J.S.A. § 2C:21-10. The Third Circuit has approved a jury instruction that the "three elements needed in order to establish a violation of the New Jersey commercial bribery statute" are: "that the defendant solicited, accepted or agreed to accept a benefit; . . . that the defendant did so in consideration for knowingly violating or agreeing to violate a duty of fidelity; [and] that the defendant owed that duty of fidelity" in his capacity as one of the specifically enumerated parties in the statute. *United States v. Lee*, 359 F.3d 194, 204 (3d Cir. 2004).

### B. Analysis

To repeat, Counts Five through Seven incorporate the conspiracy allegations and specifically allege that BLS received approximately $300 via an interstate bank wire from

NOT FOR PUBLICATION

Medicare on August 11, 2011 for blood tests ordered by Defendant after he accepted a July 2011 "consulting agreement" check, *see* ECF No. 1 ¶ 11(d) (Count Five); that Craig Nordman sent a text message to Defendant reading "Your party is confirmed!" on December 7, 2011 in connection with Defendant's request that BLS pay for his office holiday party, *see id.* ¶ 11(j) (Count Six); and that Nordman sent a text message to Defendant reading "On my way. 20 min away" on December 4, 2012 in connection with Nordman's hand delivery of a "consulting agreement" bribe check, *see id.* ¶ 11(cc) (Count Seven). *Id.* ¶¶ 1-2.

Defendant argues that the Travel Act charges are impermissibly vague because there is no authority clearly defining the "duty of fidelity" that Defendant allegedly owed to his patients, as required to prove a violation of the Travel Act's predicate "unlawful activity," the violation of the New Jersey Bribery Statute. ECF No. 7-12 at 28-32. Defendant's claim is essentially that, even accepting as true the indictment's allegations that Defendant received the two "consulting agreement" checks and the holiday party payment in exchange for referring his patients' blood tests to BLS, the New Jersey Bribery Statute did not give him "fair warning" that (a) he owed a duty of fidelity to these patients or (b) the bribes and referrals violated this duty of fidelity.

### 1.   Defendant's alleged conduct violates the New Jersey Bribery Statute

Defendant is correct that neither the Third Circuit nor the New Jersey Supreme Court has defined the duty of fidelity owed by a physician under the New Jersey Bribery Statute. ECF No. 7-12 at 30. New Jersey regulations governing the conduct of physicians, however, demonstrate that this duty includes the duty to refrain from accepting bribes or kickbacks in exchange for patient referrals.

The New Jersey State Board of Medical Examiners ("New Jersey Medical Board"), an administrative entity created by the New Jersey State Board of Medical Examiners Law, N.J.S.A.

NOT FOR PUBLICATION

45:9-1 *et al.*, is responsible for licensing physicians who practice medicine in New Jersey, *see*

N.J.S.A. 45:9-6, and "[e]stablish[ing] professional standards for persons licensed" in the state.

N.J.S.A. 45:9-27.26(17)(c). The New Jersey Medical Board is authorized to promulgate

regulations governing the qualifications and conduct of physician licensees. *See* N.J.S.A. 45:9-2.

Although neither the New Jersey State Board of Medical Examiners statute nor the Medical

Board's regulations define a "duty of fidelity" owed by physicians, as referenced in the New

Jersey Anti-Bribery statute, the New Jersey Medical Board promulgated a rule in 1992, entitled

"Professional Fees and Investments, Prohibition of Kickbacks," that explicitly prohibits the

acceptance of bribes and kickbacks by doctors licensed in New Jersey:

> A licensee shall not, directly or indirectly, give to or receive from any licensed or
> unlicensed source a gift of more than nominal (negligible) value, or any fee,
> commission, rebate or bonus or other compensation however denominated, which
> a reasonable person would recognize as having been given or received in
> appreciation for or to promote conduct by a licensee including . . . making or
> receiving a referral to or from another for professional services.

N.J.A.C. 13:35-6.17(c)(1) (2016); *see also* N.J.A.C. 13:35-6.17(c)(1) (2005) (same text). The

regulation states, as example, that a "licensee who refers a patient to a health care service . . .

shall not accept from nor give to the health care service a fee directly or indirectly in connection

with the referral." *Id*. Although the regulation includes an exception for real estate rental

agreements, *see* N.J.A.C. 13:35-6.17(h), Defendant Greenspan is not charged with violating the

New Jersey Bribery Statute by accepting checks under the rental agreement.

Defendant Greenspan's alleged acceptance of bribes from BLS in exchange for blood test

referrals was explicitly prohibited by the New Jersey state agency that regulates the conduct of

physicians during the entirety of his alleged conspiracy. The indictment properly alleges that

Defendant "owed a fiduciary duty to his patients" and "had a duty of honest services to his

patients that included the duty to refrain from accepting, or agreeing to accept, bribes and

NOT FOR PUBLICATION

kickbacks offered in exchange for patient blood specimen referrals." ECF No. 1 ¶ 5. The

indictment properly pleads that Defendant breached this duty.

### 2.  The Statute is not void for vagueness as applied to Defendant's alleged conduct

Defendant argues that the statute is nevertheless impermissibly vague when applied to his

own actions, *Fullmer*, 584 F.3d at 152, because he did not engage in the "express quid pro quo

conduct," but instead received payments from BLS "in exchange for the provisions of something

of value other than the referral of blood samples." ECF No. 7-12 at 30. Defendant compares his

alleged actions with those of the defendant in *United States v. Ostrager*, another physician who

faced Travel Act charges based on an alleged violation of the New Jersey Bribery Statute for

referring blood samples to BLS. No. 15-cr-399 (D.N.J. 2015). In *Ostrager*, Judge Chesler found

that the New Jersey Bribery Statute was not void for vagueness with respect to the defendant's

acceptance of cash bribes, but he speculated that it "might very well be argued that there was an

issue as to whether or not that duty of fidelity were violated where a patient were sent to a testing

facility where the testing facility rented space in the doctor's office and paid a monthly rent. That

arguably might implicate vagueness issues." *Ostrager*, Transcript of Proceedings of hearing on

Motion to Dismiss, ECF No. 12 at 37:11-16 (D.N.J. Dec. 4, 2015) (incorporated into Order

Denying Motion to Dismiss, ECF No. 13 (D.N.J. Dec. 9, 2015)).

Defendant correctly states that the indictment charges him with accepting monthly "sham

'rent' checks of approximately $2,000 to 2,500 per month to induce the referral of patient blood

specimens to BLS." ECF No. 1 ¶ 10(a), as well as monthly "service agreement" and "consulting

agreement" payments. *Id*. ¶ 10(b), (d). Defendant argues that the rental and service agreements

were drafted by counsel, specifically addressed Defendants' obligations under various federal

32

NOT FOR PUBLICATION

and state statutes and state and AMA ethical guidelines, and "definitively disclaim[ed] any obligation of Dr. Greenspan to make referrals in exchange for the consideration being paid." ECF No. 7-12 at 31. These documents allegedly gave Defendant "firm reason to believe that his receipt of payments pursuant thereto was not violative of *any* law or regulation." *Id.*

The Travel Act charges, however, are not premised on Defendant's alleged acceptance of rental or service agreement checks. Count Six, which charges Defendant with violating the New Jersey Bribery Statute and Travel Act by accepting soliciting and accepting payment for an office holiday party, is an example of the "express quid pro quo conduct" that Judge Chesler found was "clearly inappropriate" under the New Jersey Statute. *Ostrager*, ECF No. 12 at 34:14-17, 37:17-18. Counts Five and Seven charge Defendant in connection with his acceptance of "consulting agreement" checks, which Defendant does *not* claim he received under an agreement drafted by counsel addressing his ethical or legal obligations. Nor does Defendant actually claim that he provided "something of value" in exchange for the consulting agreement checks. As charged, Defendant's acceptance of the consulting agreement checks is also "express quid pro quo conduct." The Court finds that the New Jersey Bribery Statute is not impermissibly vague with respect to the actions alleged in any of the Travel Act charges in the indictment.[1] Because the conspiracy to commit Travel Act violations alleged in Count One is premised on the same overt acts alleged in Counts Five through Seven, the Court will deny Defendant's motion to dismiss that Count as well.

---

[1] To the extent Defendant argues that, as a matter of law, the service and rental agreements protect the acceptance of other payments *not* received under the agreements, such as consulting agreement checks and the office holiday party payment, he provides no basis for this conclusion. To the extent Defendant argues that the service and rental agreements negate the "knowing and willing" aspect of his acceptance of the consulting agreement checks and office holiday party payment, this is a question of fact to be determined by a jury.

NOT FOR PUBLICATION

## IV.    The indictment adequately alleges violations of the federal honest services fraud statute

Defendant Greenspan argues that Counts Eight through Ten of the indictment, which charge him with committing honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and the conspiracy to commit honest services wire fraud charge in Count One must be dismissed for similar reasons: medical doctors have no clearly defined duty of honest services to their patients within the meaning of the federal honest services fraud statute. Again, the Court disagrees.

### A.  Applicable Law

"The elements of mail and wire fraud," as prohibited by 18 U.S.C. § 1343, "are (1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or write transmissions in furtherance of the scheme." *National Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012). The term "scheme or artifice to defraud" encompasses "a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, but only to the extent that such a scheme reaches "fraud based on bribes and kickbacks and not based on a failure to disclose a conflict of interest." *United States v. Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013) (citing *Skilling v. United States*, 561 U.S. 358, 409-12 (2010) ("[W]hatever the school of thought concerning the scope and meaning of § 1346, it has always been 'as plain as pikestaff' that bribes and kickbacks constitute honest-services fraud.") (quoting *Williams v. United States*, 341 U.S. 97, 101 (1951))).

### B.  Analysis

To repeat, Counts Eight through Ten allege that, as part of the scheme to defraud Defendant Greenspan's patients of their right to his honest services as their physician, Defendant

34

NOT FOR PUBLICATION

caused Medicare to make payments to BLS via interstate wire on May 18, 2012 for blood tests

unlawfully referred by Defendant on April 27, 2012 in exchange for a "consulting agreement"

bribe check received on April 4, 2012, *see id.* ¶ 11(o)-(q), (u) (Count Eight); on June 14, 2012

for blood tests unlawfully referred by Defendant on May 23, 2012 in exchange for a consulting

agreement bribe check received on May 8, 2012 , *see id.* ¶ 11(r)-(t), (v)-(w) (Count Nine); and

October 18, 2012 for blood tests unlawfully referred by Defendant on September 19, 2012 in

exchange for a consulting agreement bribe check received on September 10, 2012, *see id.* ¶

11(x)-(bb). *Id.* ¶¶ 5.

Defendant does not contest that the indictment charges him with causing the use of the

wires, nor does he contest that the indictment charges him with receiving bribes and kickbacks

from BLS. Instead, Defendant argues that Counts Eight through Ten of the indictment must be

dismissed because it is not clear that his patients had a right to his "honest services" within the

meaning of 18 U.S.C. § 1346. ECF No. 7-12 at 32-33. The Court disagrees.

### 1.  The Honest Services Fraud statute extends to private individuals

Defendant first claims that, "[h]istorically, 18 U.S.C. § 1346 has been utilized in the

Third Circuit to thwart corruption and self-dealing by public and quasi-public officials." ECF

No. 7-12 at 32 (citing cases). This may be true, but the statute also governs the conduct of private

individuals. In *Skilling v. United States*, the Supreme Court explicitly recognized 18 U.S.C. §

1346's "application to state and local corruption and to private sector fraud." 561 U.S. 358, 413

n.45 (2010); *see also United States v. Nayak*, 769 F.3d 978, 982 (7th Cir. 2014) (Rejecting

argument that honest services fraud conviction in private sector case required showing of

"tangible harm" to victims beyond denial of honest services, "most notably because the proposed

distinction between private and public corruption has no textual basis in § 1346" and because

NOT FOR PUBLICATION

"*Skilling* clearly states that private fraud schemes fall under § 1346") (citing *Skilling*, 561 U.S. at 413 n.45)).

### 2. The indictment adequately alleges that Defendant Greenspan engaged in a scheme to deprive his patients of their right to his honest services

Incorporating his argument about the vagueness of the Travel Act charges, Defendant Greenspan claims that "there is no authority which defines at all the duty of fidelity that Dr. Greenspan owes to his patients . . . upon which the Dishonest Service charges are based," ECF No. 7-12 at 33, rendering Counts Eight through Ten and the honest services fraud conspiracy charge in Count One impermissibly vague.

The Court agrees with Defendant that breach of a fiduciary duty is an element of honest services fraud under 18 U.S.C. § 1346. *See Skilling*, 561 U.S. at 407 (observing that "vast majority" of pre-statutory honest services fraud cases "involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes"); *Nayak*, 769 U.S. at 981 (reading *Skilling* to hold that "'violation of a fiduciary duty' was a prerequisite to an honest-services fraud conviction"); *United States v. Milavanovic*, 678 F.3d 713, 722 (9th Cir. 2012) ("A close examination of the Supreme Court's opinion in *Skilling* reveals that embedded in the Court's holding . . . is the implication that a breach of fiduciary duty is an element of honest services fraud.").

As discussed, Defendant owed a duty under the New Jersey Medical Board anti-kickback regulation, N.J.A.C. 13:35-6.17(c)(1), and the New Jersey Bribery Statute to refrain from accepting, or agreeing to accept, bribes and kickbacks in exchange for patient blood specimen referrals. The indictment alleges that Defendant owed this duty, ECF No. 1 ¶ 2, and that he knowingly and intentionally devised a scheme to defraud his patients of his honest services under

NOT FOR PUBLICATION

that duty by accepting bribes and kickbacks. *Id.* ¶ 3. The indictment adequately alleges that Defendant engaged in honest services wire fraud, and the honest services statute is not impermissibly vague with respect to Defendant's specific actions and clearly defined duty.

**V.     The charges are not multiplicitous**

Defendant claims that the Anti-Kickback Statute, Travel Act, and honest services wire fraud charges in Counts Two through Ten of the indictment are impermissibly multiplicitous and must be dismissed. This argument is without merit.

**A.  Applicable law**

"A multiplicitous indictment charges the same offense in two or more counts and may lead to multiple sentences for a single violation, a result prohibited by the Double Jeopardy Clause" of the Fifth Amendment to the United States Constitution. *United States v. Pollen*, 978 F.2d 78, 84 (3d Cir. 1992). "Importantly, the Double Jeopardy Clause prohibits repeat trials [or prosecutions] for the same offense, not for the same conduct. Accordingly, a defendant may be subject to multiple prosecutions for the same conduct if Congress intended to impose multiple punishments for that conduct. . . . In other words, a defendant generally may be subject to multiple prosecutions so long as each prosecution involves a difference offense." *United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) (citing *Albernaz v. United States*, 450 U.S. 333 (1981)). In *Blockburger v. United States*, the Supreme Court held that, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires a proof of a fact which the other does not." *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "Also of central importance is whether the legislature intended to make separately punishable the

NOT FOR PUBLICATION

different types of conduct referred to in the various counts." *United States v. Stanfa*, 685 F.2d 85, 86-87 (3d Cir. 1982).

"While the Double Jeopardy Clause may protect a defendant against cumulative punishments for convictions on the same offense, the Clause does not prohibit the State from prosecuting [a defendant] for multiple offenses in a single prosecution." *Ohio v. Johnson*, 467 U.S. 493, 500 (1984).

### B.  Analysis

Defendant argues that "if the Government is able to prove Dr. Greenspan accepted bribes or kickbacks at the expense of his patients' care, he will face sentencing on three . . . separate charges for the exact same conduct" because all charges involve allegations that he received bribes from BLS. ECF No. 7-12 at 35.

This is incorrect. As an initial matter, Counts Two through Ten each charge Defendant Greenspan in connection with the receipt of a separate individual bribe or kickback. Although prosecutors may not divide up a single "unit of prosecution" into pieces and convict a defendant separately of each piece, *United States v. Lacy*, 446 F.3d 448, 456 (3d Cir. 2006), Defendant is accused of multiple individual acts, not a single unit of prosecution. *Cf. id.* (discussing, as example, that "a baker that baked four loaves of bread on a Sunday could only be convicted once under a statute that prohibited working on a Sunday"); *United States v. Chagra*, 653 F.2d 26, 30 (1st Cir. 1981) (discussing, as example, that "the man who steals $100 from a billfold can be prosecuted once for the $100 theft and not ten times for ten $10 thefts"). As the Court has discussed, the three separate bribes Defendant is charged with receiving in the Anti-Kickback Statute charges are different from the three separate bribes he is charged with receiving in the Travel Act charges and the three separate bribes he is charged with receiving in the honest

NOT FOR PUBLICATION

services fraud charges. Defendant is charged with receiving nine specific bribes or kickbacks on nine separate dates, as well as with traveling or using facilities of interstate commerce on three occasions and using or causing the use of the wires on three separate occasions.

In any event, the *Blockburger* test reveals that each of the charged offenses requires "a proof of a fact which the other[s do] not." *Blockburger*, 284 U.S. at 304. The Anti-Kickback Statute requires proof that Defendant received a bribe or kickback in exchange for the referral of an "item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)(A)). The Travel Act and honest services fraud statutes do not require any nexus to a Federal health care program. The Travel Act requires proof that Defendant traveled in or caused another to travel in or make use of interstate commerce facilities, 18 U.S.C. 1952(a)(1) and (3), in furtherance of a violation of his duty of fidelity to his patients, N.J.S.A. 2C:21-10. The honest services wire fraud statute requires proof that Defendant caused the use of the wires, 18 U.S.C. § 1343, in furtherance of a violation of his duty of honest services to his patients. 18 U.S.C. § 1346.

The Court recognizes that, as charged, the Travel Act violation alleged in Count Five, which is premised on the transmission of a bank wire to BLS and Defendant's violation of a duty to his patients, *see* ECF No. 1 ¶¶ 11(d), 2; and the honest services wire fraud violations alleged in Counts Eight through Ten, which are also premised on the transmission of bank wires to BLS and Defendant's violation of a duty to his patients, *see* ECF No. 1 ¶¶ 11(u), (w), (bb), 2; essentially require proof of the same elements. The Court repeats that these Counts involve *different* bank wires and *different* breaches of Defendant's duty to patients, so the Double Jeopardy Clause is inapplicable.

NOT FOR PUBLICATION

Regardless, any question of double jeopardy will be rendered moot if the United States fails to convict on any or all of the purportedly multiplicitous counts. Courts may cure potentially multiplicitous counts after trial, before a defendant is sentenced. *See United States v. Felder*, 2007 WL 172368, at *1 (E.D. Pa. Jan. 11, 2007) ("[E]ven if the counts here did involve multiplicitous counts . . . the appropriate curative response would be to merge them at the time of sentencing or to dismiss all but one of them prior to sentencing, as opposed to prior to trial.") (citing *United States v. Blyden*, 930 F.2d 323, 328 (3d Cir. 1991). To act now would be premature. Defendant's motion to order the dismissal of multiplicitous charges is denied.

## VI.    The Court will not depart from its discovery order and require the early production of *Brady*, *Giglio*, or Jencks Act materials

Defendant requests that the Court order the United States to immediately provide him with all material favorable to his defense, as required by *Brady v. Maryland*, 373 U.S. 83 (1963); all material that may impeach or otherwise alter the jury's credibility judgment of a prosecution witness, as required by *Giglio v. United States*, 405 U.S. 150 (1972); and all statements or reports made by government witnesses, as required the Jencks Act, 18 U.S.C. § 3500. ECF No. 7-12 at 36-41.

Under the order for discovery and inspection issued by the Court on April 6, 2016, ECF No. 6, the United States already has a continuing duty to disclose all *Brady* material to Defendant, *Id.* ¶¶ 1(f), 5, and the Court has received no indication that the United States has failed or will fail to comply with its obligation. The Court denies Defendant's request as premature. The Court's discovery order also requires the United States to produce all *Giglio* and Jencks Act material "sufficiently in advance of the witness's testimony to avoid delay in the trial," *id.* ¶ 4, and the Court has received no indication that the United States has failed or will

NOT FOR PUBLICATION

fail to comply with these obligations either. The Court denies Defendant's *Giglio* and Jencks Act requests as premature.[2]

**VII.    Defendant may issue subpoenas *duces tecum* and file additional pre-trial motions as permitted by the relevant Federal Rules of Criminal Procedure.**

Defendant seeks permission to issue subpoenas *duces tecum* to unnamed attorneys for BLS seeking documents regarding their work in connection with the creation of the Medical Practice consulting, services, and rental agreements. ECF No. 7-12 at 38-39. The United States does not address this request in its response to Defendant's omnibus motion. Defendant may issue subpoenas in accordance with the provisions of Fed. R. Crim. P. 17(c).

Defendant finally requests that the Court permit him to file additional, unspecified pre-trial motions in this matter. ECF No. 7-12 at 41. The Court does not rule now on the permissibility of hypothetical motions. Defendant may file additional motions as permitted by the relevant Federal Rules of Criminal Procedure.

CONCLUSION

Defendant's motions to dismiss the indictment in its entirety, to dismiss the Anti-Kickback Statute and conspiracy to violate the Anti-Kickback Statute Counts, to dismiss the Travel Act and conspiracy to violate the Travel Act Counts, and to dismiss the honest services wire fraud and conspiracy to commit honest services wire fraud counts are denied. Defendant's request for early disclosure of *Brady*, *Giglio*, and Jencks Act material is denied as premature.

---

[2] In any event, the Third Circuit has held that "[t]he blunt command of the [Jencks Act] together with the unequivocal legislative history has led to unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until the conclusion of the direct examination at trial." *United States v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978). The Court lacks the authority to grant Defendant Greenspan the early Jencks Act discovery he seeks.

NOT FOR PUBLICATION

Defendant may issue subpoenas or file additional motions to the extent such actions are

permitted by the relevant Federal Rules of Criminal Procedure. An appropriate order follows.

DATE: _16 August 2016_

_William H. Walls_
Senior United States District Court Judge